UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARCELA VIZCAINO FOR ANTHONY
VIZCAINO,

                    Plaintiff,

-vs-                                                        Case No.  6:04-cv-1158-Orl-JGG

JO ANNE B. BARNHART, Commissioner of
the Social Security Administration,

                    Defendant.
_____/

## MEMORANDUM OF DECISION

On behalf of her minor son, Anthony Vizcaino ["Anthony"], plaintiff Marcela Vizcaino

["Vizcaino"] appeals to the district court from a final decision of the Commissioner of Social

Security [the "Commissioner"] denying Anthony's claim for supplemental security income ["SSI"]

insurance benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the

Commissioner's decision is **AFFIRMED**.

## I.    PROCEDURAL HISTORY

Vizcaino is Anthony's mother and guardian.  Vizcaino protectively filed an application for

childhood SSI on behalf of Anthony on October 4, 2000.  She alleged an onset of disability as of

September 14, 1994.  R. 53-56.  The Social Security Administration denied the application for SSI

benefits initially and on reconsideration.  R. 22-28.

-1-

The Honorable Deirdre R. Horton, Administrative Law Judge ["ALJ"] conducted a hearing on July 29, 2003 in New Haven, Connecticut.[1]  R. 257-91.  Anthony and Marcela testified at the hearing.  Anthony was not represented by an attorney.  On February 24, 2004, the ALJ issued her eight-page decision finding that Anthony was not disabled.  Following a brief review of the evidence, the ALJ found that Anthony's impairments (bilateral hip pain post operation for slipped capital epiphysis) were "severe," but found that they did not meet, medically equal, or functionally equal the listing.  R. 21, Findings 3-4.  The ALJ also found that Anthony did not have extreme limitations in any domain, or a marked limitation in any two domains, and therefore did not functionally equal the severity of the listings.  R. 21, Finding 5.   Finally, the ALJ found Anthony's testimony and subjective allegations not fully credible, and concluded that Anthony was not disabled.  R. 21, Findings 6-7.

On May 27, 2004, the Appeals Council denied review.  R. 5-7.  Anthony was fourteen years old at the time of the Appeals Council's decision.  On July 28, 2003, Anthony timely appealed the Appeals Council's decision to deny review to the United States District Court.  Docket No. 1.  On March 4, 2005, Anthony filed a memorandum of law in support of her appeal of the denial of review.  Docket No. 16.  On May 3, 2005, the Commissioner filed a memorandum in support of her decision that Anthony was not disabled.  Docket No. 17.  Anthony is now fifteen years old.  The appeal is ripe for determination.

---

[1]Anthony moved to Kissimmee, Florida, prior to commencement of this action.  *See* Complaint at 1, ¶ 4 [Docket. No. 1].

## II.      THE PARTIES' POSITIONS

Anthony contends that the Commissioner erred by:  1.) failing to fully develop the record by not ordering a consultative examination regarding Anthony's hip impairments; and 2.) failing to find that Anthony had at least a marked limitation in three domains.  The Commissioner argues that substantial evidence supports her decision to deny disability because Anthony's condition did not meet the new definition of disability for children, as Anthony did not meet, medically equal, or functionally equal any listed impairment, and because Anthony did not have marked or extreme functional limitations.

## III.     THE STANDARD OF REVIEW

### A.      Affirmance

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405 (g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir.

1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

**B.     Reversal and Remand**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.  42. U.S.C. § 405 (g)(Sentence Four).  The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  This Court may reverse the decision of the Commissioner and enter an order awarding disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences.  *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by

substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow him to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g).

To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[2]  *Id.*

## IV.    THE LAW

### A.    The Old "Comparable Severity" Standard for Childhood Disability

Before 1990, a child was "disabled" if she suffered from any medically determinable physical or mental impairment of "comparable severity" to an impairment that would prevent an adult from working.  42 U.S.C. § 1382c (a)(3)(1982).  On February 20, 1990, the United States Supreme Court

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six.  *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text.  In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction.  *Id.*  In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court.  *Id.*

decided *Sullivan v. Zebley*, 493 U.S. 521 (1990).  The Supreme Court determined that the Commissioner's childhood SSI disability regulations and rulings had failed to implement the SSI statute enacted by Congress.  The regulations were manifestly contrary to the statute, and exceeded the Commissioner's statutory authority.  493 U.S. at 541.

The statute generally defined disability in terms of an individualized, functional inquiry into the effect of medical problems on an adult's ability to work  —  or in terms of a "comparable severity" in the case of a child.  493 U.S. at 528 - 29.  The Commissioner, however, had established medical criteria for listed impairments that were more restrictive and more severe than the statutory standard for disability in order to operate as a presumption of disability that makes further inquiry unnecessary.  493 U.S. at 532 - 33, 539.  An adult whose impairment did not meet the listings had the opportunity to show that his impairment in fact prevented him from working, but a child whose impairment did not meet the listings had no similar opportunity.  493 U.S. at 534 - 35.

The Supreme Court  rejected the Commissioner's argument that a functional analysis of childhood disability was not feasible, and that a "listings-only" approach to childhood disability was the only practicable way to determine whether a child's impairment was "comparable."  493 U.S. at 539 - 40.  After *Zebley*, the Commissioner "substantially liberalized" the childhood SSI eligibility regulations to provide for an individualized functional analysis.  *See* S. REP. NO. 104-96, 104th Cong., 1st Sess. 1995 (available on Westlaw at 1995 WL 351655).

The old statutory and regulatory criteria required the ALJ to apply a four-step evaluation process.  *See* 42 U.S.C. § 1382c (a)(3)(A);  20 C.F.R. § 416.924 (b);  *accord, Wilson v. Apfel*, 179 F.3d 1276, 1278 n.1 (11th Cir. 1999); *Brown v. Callahan*, 120 F.3d 1133, 1134 - 35 (10th Cir. 1997).

First, the ALJ had to determine whether the child was engaged in substantial gainful activity.  *See* 20 C.F.R. § 416.924 (c).  If so, she was not disabled.  If the child was not engaged in substantial gainful activity, the ALJ had to determine whether she had a severe impairment.  *See* 20 C.F.R. § 416.924 (d).  If not, she was not disabled.  If the child had a severe impairment, the ALJ had to determine whether that impairment met or equaled an impairment listed in 20 C.F.R. Part 404, subpt. P, app. 1 ["the Listings"].  *See*  20 C.F.R. § 416.924 (e).  If the impairment met or equaled a listing, the child would be deemed disabled.  *See id.*  If not, the evaluation would proceed to the fourth step, in which the ALJ would make an individualized functional assessment ["IFA"] to determine whether the child had an impairment or impairments of comparable severity to that which would prevent an adult from engaging in substantial gainful activity.  *See* 20 C.F.R. § 416.924 (f);  *accord, Brown*, 120 F.3d at 1134 - 35.

### B.     The Legislative History Preceding the New Standard

The Human Resources Subcommittee of the House promptly took note of the holding in *Sullivan v. Zebley*,[3] and monitored both the Commissioner's implementation of the decision and the decision's effect on the Social Security Administration.  H.R. REP. NO. 102-431, 102nd Cong., 2nd Sess. 1992 (available on Westlaw at 1992 WL 35799);  *accord,* H.R. REP. NO. 103-506, 103rd Cong., 2nd Sess. 1994, 1994 U.S. CODE CONG. & AD. NEWS 1494 (available on Westlaw at 1994 WL

---

[3]The Subcommittee summarized the *Zebley* holding as follows:  1.) in establishing the definition of childhood disability, Congress intended that the Commissioner perform an individualized assessment of the child's functioning when he decides whether the child is disabled, just as he must do for adults; and 2.) although a vocational analysis is inapplicable to children, a functional analysis may be applied to children through an inquiry into the impact of an impairment on the normal, age-appropriate daily activities of a child, such as speaking, walking, washing, dressing, feeding, going to school, playing, and all the other activities in which children normally engage.  *Id.*

188483) .  As a result of *Zebley*, the Social Security Administration expected to process about

240,000 retroactive *Zebley* claims; 75,000 reconsiderations; 33,000 hearings; and 7,000 Appeals

Council reviews.  The Commissioner expected to reevaluate 60,000 childhood disability claims

denied since the decision, and expected an additional 125,000 blind or disabled children on SSI by

the end of fiscal year 1992.  *Id.*  The Senate Committee on Finance later noted that "the *Zebley*

decision was based on limited legislative history and obscure statutory language regarding the

children's SSI program, which the Committee is now correcting."  *See* S. REP. NO. 104-96, 104th

Cong., 1st Sess. 1995 (available on Westlaw at 1995 WL 351655).

Congress most thoroughly articulates its intent in replacing the "comparable severity"

standard with a new definition of childhood disability in the House Conference Report to P.L. 104-

193, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, dated July 30,

1996.  *See* H.R. CONF. REP. NO. 104-725, 104th Cong., 2nd Sess. 1996, 1996 U.S. CODE CONG. &

AD. NEWS 2649 (available on Westlaw at 1996 WL 443732 at 744).[4]  The conference agreement on

the definition of childhood disability provides as follows:

> The conference agreement follows the Senate amendment.  The conferees
> intend that only needy children with severe disabilities be eligible for SSI, and **the**
> **Listing of Impairments and other current disability determination regulations**
> **as modified by these provisions properly reflect the severity of disability**
> **contemplated by the new statutory definition**.  In those areas of the Listing that
> involve domains of functioning, the conferees expect no less than two marked
> limitations as the standard for qualification. The conferees are also aware that SSA
> uses the term "severe" to often mean "other than minor" in an initial screening

---

[4]*Accord,* H.R. REP. NO. 104-651, 104th Cong., 2nd Sess. 1996 (available on Westlaw at 1996 WL 393655 at 2957);  H.R. CONF. REP. NO. 104-350, 104th Cong., 1st Sess. 1995 (available on Westlaw at 1995 WL 709269 at 3875 - 76).

procedure for disability determination and in other places. The conferees, however, use the term "severe" in its common sense meaning.

In addition, the conferees expect that SSA will properly observe the requirements of section 1614 (a)(3)(F) of the Social Security Act [42 U.S.C. § 1382c (a)(3)(G)] and ensure that the combined effects of all the physical or mental impairments of an individual under age 18 are taken into account in making a determination regarding eligibility under the definition of disability. The conferees note that the 1990 Supreme Court decision in Zebley established that SSA had been previously remiss in this regard. **The conferees also expect SSA to continue to use criteria in its Listing of Impairments and in the application of other determination procedures, such as functional equivalence**, to ensure that young children, especially children too young to be tested, are properly considered for eligibility of benefits.

The conferees recognize that there are rare disorders or emerging disorders not included in the Listing of Impairments that may be of sufficient severity to qualify for benefits. **Where appropriate, the conferees remind SSA of the importance of the use of functional equivalence disability determination procedures.**

Nonetheless, **the conferees do not intend to suggest by this definition of childhood disability that every child need be especially evaluated for functional limitations**, or that this definition creates a supposition for any such examination. **Under current procedures for writing individual listings, level of functioning is an explicit consideration in deciding which impairment, with certain medical or other findings, is of sufficient severity to be included in the Listing**. Nonetheless, the conferees do not intend to limit the use of functional information, if reflecting sufficient severity and is [sic] otherwise appropriate.

The conferees contemplate that Congress may revisit the definition of childhood disability and the scope of benefits, if deemed appropriate, and have provided elsewhere for studies on these issues.

H.R. CONF. REP. NO. 104-725, 104th Cong., 2nd Sess. 1996, 1996 U.S. CODE CONG. & AD. NEWS

2649 (available on Westlaw at 1996 WL 443732 at 744) (emphasis supplied). Congress has created

a Commission of Childhood Disability to further study the appropriateness of an alternative

definition of childhood disability. *See* SEN. REP. NO. 105-36 (II), 105th Cong., 1st Sess. 1997

(available on Westlaw at 1997 WL 374928 at 766).

**C.**     **The New "Functional Limitations" Standard for Childhood Disability**

    **1.**     **The New Act and Statute**

On August 22, 1996, the President signed into law the Personal Responsibility and Work

Opportunity Reconciliation Act, Pub.L. No. 104-193, 110 Stat. 2105.[5]  The Act amended the

substantive standard for evaluating children's disability claims to read as follows:

> An individual under the age of 18 shall be considered disabled for the purposes of this
> subchapter if that individual has a medically determinable physical or mental
> impairment, **which results in marked and severe functional limitations**, and which
> can be expected to result in death or which has lasted or can be expected to last for a
> continuous period of not less than 12 months.

 42 U.S.C. § 1382c (a)(3)(C)(codification of the Act)(emphasis supplied).  A "physical or mental

impairment" is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques."  42 U.S.C. § 1382c (a)(3)(D).  The statute does not define "marked and severe

functional limitations."

    In determining the severity of impairments, the Commissioner must consider the combined

effect and combined impact of all of the individual's impairments.  42 U.S.C. § 1382c (a)(3)(G).  In

determining the disability of a child, the Commissioner must make reasonable efforts to ensure that a

*qualified pediatrician or other specialist* evaluates the case.  42 U.S.C. § 1382c (a)(3)(i).

---

[5]Section 211 (d)(1) of the Act, Pub. L. 104-193, 1996 H.R. 3734, 110 Stat. 2105, 2190 (found in the notes
following 42 U.S.C. § 1382c states that the new standard for evaluating children's disability claims applies to all cases
which have not been finally adjudicated as of the effective date of the Act, August 22, 1996, including those cases in
which a request for Appeals Council review is pending.  *See also, Brown v. Callahan*, 120 F.3d 1133, 1134 - 35 (10th
Cir. 1997);  *Nelson v. Apfel*, 131 F.3d 1228, 1234 - 35 (7th Cir. 1997);  *Jamerson v. Chater*, 112 F.3d 1064, 1065-66
(9th Cir. 1997).  Thus, the new version of the Act applies to this case.

Congress also chose to directly change specific sections of the Commissioner's childhood SSI regulations.  Section 211 (b) of the Act contains the following uncodified changes to the regulations:

> (b)    CHANGES TO CHILDHOOD SSI REGULATIONS.  --
> (1)    MODIFICATION TO MEDICAL CRITERIA FOR EVALUATION OF MENTAL AND EMOTIONAL DISORDERS.  --  The Commissioner of Social Security shall modify sections 112.00C.2. and 112.02B.2.c.(2) of appendix 1 to subpart P of part 404 of title 20, Code of Federal Regulations, to eliminate references to maladaptive behavior in the domain of personal/behavioral function.
> (2)    DISCONTINUANCE OF INDIVIDUALIZED FUNCTIONAL ASSESSMENT.  --  The Commissioner of Social Security shall discontinue the individualized functional assessment for children set forth in sections 416.924d and 416.924e of title 20, Code of Federal Regulations.

Pub. L. 104-193, 1996 H.R. 3734, 110 Stat. 2105, 2189.

Congress evidently intended to exercise direct control over the details of the implementing regulations, even though Congress normally leaves these to the discretion of the responsible agency. Pursuant to the Act, references to "maladaptive behavior" have since been removed from the regulations.  *See* superseded text of §§ 112.00 (C)(2)(c) and 112.02 (B)(2)(c)(2) in Part 404, Subpart P, App. 1 and 2.  Effective April 14, 1997, the Commissioner also removed 20 C.F.R. § 416.924d and § 416.924e pertaining to individualized functional assessment for children.  Congress also required the Commissioner to submit to Congress for review any final regulation pertaining to the eligibility of children for SSI benefits.  Pub.L. 104-193, § 211 (d)(4), as amended Pub.L. 105-33, § 5101, 111 Stat. 595.

## 2.    The New Regulations

Under express statutory authority, 42 U.S.C. § 405 (a), the Commissioner promulgates regulations governing eligibility for SSI benefits.  20 C.F.R. Part 416, Subpart I;  *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  Effective April 14, 1997, the Commissioner promulgated detailed interim final rules to guide the implementation of the new statute.  *See* Childhood Disability Provisions, 62 Fed. Reg. 6408 (1997);  *accord, Nelson*, 131 F.3d at 1234 - 35. The new regulations are codified at  20 C.F.R. §§ 416.902; 416.906; 416.924 through 416.926a.[6]

The regulations define the statutory term "marked and severe functional limitations" for children as "a level of severity that meets or medically or functionally equals the severity of a listing in the Listing of Impairments in appendix 1 of subpart P of part 404 (the Listing)."  20 C.F.R. §§ 416.902; *see also* 416.906; 416.924 through 416.926a.[7]

The regulations set forth the steps used in determining disability for children.  20 C.F.R. § 416.924 (effective April 14, 1997):

> We follow a set order to determine whether you are disabled.  If you are doing substantial gainful activity, we will determine that you are not disabled and not review your claim further.  If you are not doing substantial gainful activity, we will consider your physical or mental impairment(s) first to see if you have an impairment or combination of impairments that is severe.  If your impairment(s) is not severe, we will determine that you are not disabled and not review your claim further.  If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals in severity any impairment that is listed in appendix 1 of subpart P of part 404 of this chapter.  If you

---

[6] The superseded text of all regulations appears in 20 C.F.R. following the revised text.

[7] Part B provides medical criteria applicable to children in those instances in which Part A does not give appropriate consideration to the particular disease process in childhood.  *See* Parts A and B, Part 404, Subpart P, App. 1.

have such an impairment(s), and it meets the duration requirement, we will find that you are disabled.  If you do not have such an impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled.

20 C.F.R. § 416.924 (a).

Individualized functional assessments for children have been eliminated.  *See* Pub. L. 104-193, 1996 H.R. 3734, 110 Stat. 2105, 2189;  20 C.F.R. §§ 416.924d and 416.924e (discontinued).  The Commissioner now applies a three-part test in determining a child's disability.  The first determination is whether the child is working and performing substantial gainful activity.  20 C.F.R. § 416.924 (b).  If the child is not working, the Commissioner determines whether the child suffers from a severe impairment or combination of impairments.  20 C.F.R. § 416.924 (c).  If the child suffers from a severe impairment or combination of impairments, the Commissioner then determines whether the child's impairments meet, medically equal, or functionally equal an impairment listed under Appendix I to Subpart P of Part 404.  20 C.F.R. § 416.924 (d).  The Commissioner evaluates age, functioning, and other factors in determining whether a child meets a listing.  20 C.F.R. §§ 416.924a - 416.924c.  Provisions for medical equivalence are established in 20 C.F.R. § 416.926.

Provisions for functional equivalence are established in 20 C.F.R. § 416.926a.  Stated generally, to functionally equal a listed impairment, a child must demonstrate one "extreme" limitation in one area of functioning, or show "marked" limitation in two areas of functioning.  20 C.F.R. § 416.926a (b). There are six areas of functioning to be considered:  cognition/ communication ability;  motor ability;  social ability;  responsiveness to stimuli (birth to age one only);  personal ability (age three to age eighteen only);  and concentration, persistence, or pace (age three to age eighteen only).  20 C.F.R. § 416.926a (c)(4).

-14-

In a child disability case, the Commissioner must consider formal testing in evaluating a

child's functioning.[8]  An "extreme" limitation is present when standardized tests contained in the

_____

[8]The pertinent regulations provide:

(ii)  The medical evidence may include formal testing that provides information about your development or functioning in terms of percentiles, percentages of delay, or age or grade equivalents. Standard scores (e.g., percentiles) can be converted to standard deviations. When you have such scores, we will consider them together with the information we have about your functioning to determine whether you have a "marked" or "extreme" limitation in a domain.

      *              *              *

(iii)  If you are a child of any age (birth to the attainment of age 18), we will find that you have a 'marked' limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

      *              *              *

(iii)  If you are a child of any age (birth to the attainment of age 18), we will find that you have an 'extreme' limitation when you have a valid score that is three standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

      *              *              *

(4) How we will consider your test scores.

(i)  [W]e will not rely on any test score alone. No single piece of information taken in isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain.

(ii)  We will consider your test scores together with the other information we have about your functioning, including reports of classroom performance and the observations of school personnel and others.

      *              *              *

(iii)  If there is a material inconsistency between your test scores and other information in your case record, we will try to resolve it. The interpretation of the test is primarily the responsibility of the psychologist or other professional who administered the test. But it is also our responsibility to ensure that the evidence in your case is complete and consistent or that material inconsistencies have been resolved. Therefore, we will use the following guidelines when we resolve concerns about your test scores:

(A)  We may be able to resolve the inconsistency with the information we have. We may need to obtain additional information; e .g., by recontact with your medical source(s), by purchase of a consultative examination to provide further medical information, by recontact with a medical source who provided a consultative examination, or by questioning individuals familiar with your day- to-day functioning.

(B)  Generally, we will not rely on a test score as a measurement of your functioning within a domain when the information we have about your functioning is the kind of information typically used by medical professionals to determine that the test results are not the best measure of your day-to-day functioning. When we do not rely on test scores, we will explain our reasons for doing so in your case record or in our decision.

20 C.F.R. §§ 416.926a(e)(1)(ii), 416.926a(e)(2)(iii); 416.926a(e)(3)(iii), and 416.926(e)(4) (emphasis added).

record are used as the measure of functional abilities and contain a valid score three standard deviations[9] or more below the norm for the test, or when a child from age three to attainment of age eighteen has no meaningful function in a given area.  20 C.F.R. § 416.926a (c)(3)(ii)(A), (C).

A "marked" limitation is present when the standardized tests contained in the record are used as the measure of functional abilities and contain a valid score two standard deviations or more (but less than three) below the norm for the test, or in a child from age three to attainment of age eighteen, when the degree of limitation "seriously" interferes with the child's ability to function.  20 C.F.R. § 416.926a (c)(3)(i)(A), (C).  An ALJ who fails to determine the significance of a child's obviously low scores on standardized testing,  acts contrary to the above regulations and to his basic duty to fully develop the record.  *See Borgens v. Halter*, 2001 WL 474191, 73 Soc.Sec.Rep.Ser. 194 (M. D. Fla. March 28, 2001)(Case No. 6:99-cv-1414-Orl-19JGG); citing Cowart *v. Schweiker*, 662 F.2d 731, 735 (11 th Cir.1981) *supra*.2001 WL 474191 (M. D. Fla. March 28, 2001).

### 3.    Is the New Standard More Stringent?

The Commissioner takes the position that the new legislation adopts a stricter standard for disability in child SSI claims.  Docket No. 13 at 2, 5 - 7.  Indeed, the United States Court of Appeals for the Eleventh Circuit has agreed that the new law tightens rather than expands the definition of "disabled" with respect to children under 18, with the result that any child considered not disabled under the old law is necessarily considered not disabled under the new law as well.  *Wilson v. Apfel*, 179 F.3d 1276, 1277 - 78 (11th Cir. 1999) citing *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th

---

[9]The standard deviation figure describes the probability that the measured disparity is the result of mere chance.  *Engineering Contractors Ass'n of S. Fla. Inc. v. Metropolitan Dade County*, 122 F.3d 895, 914 (11th Cir. 1997).

Cir.1997); *Jamerson v. Chater,* 112 F.3d 1064, 1065-66 (9th Cir.1997).[10]  Other courts of appeals

have accepted the Commissioner's argument that the new law is "more stringent," and have affirmed

disability denials under the new law after finding that the ALJ had properly applied the old law.[11]

A district court normally will defer to an agency's reasonable interpretation.  *See Chevron,*

*U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984) (Courts have long

recognized that considerable weight should be accorded to an executive department's construction of

---

[10]Under prior law and the regulations thereunder, the analysis for whether a child was disabled entailed four sequential steps.  *Wilson*, 179 F.3d at 1278 n.1.  The first question was whether the claimant was engaged in substantial gainful activity.  If yes, she was not disabled.  If no, the second question was whether the claimant had a severe impairment.  If no, she was not disabled.  If yes, the third question was whether the impairment met or equaled an impairment, also known as a "Listing," in appendix 1 of 20 C.F.R. pt. 404, subpt.  P.  If yes, the child was conclusively disabled.  If no, the child could still be disabled if the fourth step was answered in the affirmative: whether the claimant had an impairment of "comparable severity" to that which would prevent an adult from engaging in substantial activity.  *Wilson*, 179 F.3d at 1278 n.1.

The effect of the 1996 legislation was to remove the fourth step.  *Wilson*, 179 F.3d at 1278 n.1.  The fourth step had essentially provided an alternative way for a child to establish that she was disabled.  The 1996 legislation truncated the sequential analysis by cutting off the fourth step, so that if the child's impairment failed to meet or equal one of the Listings, the child would be conclusively adjudged not disabled.  *Wilson*, 179 F.3d at 1278 n.1.  As amended, the relevant statutory provision states:  "An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c (a)(3)(C)(i).  The regulations promulgated following the 1996 statute preserved the first three steps in the sequential analysis, which continued to reflect properly the statutory language in subparagraph (i) coupled with the proviso in subparagraph (ii) that no child engaged in substantial gainful activity may be considered disabled.  *See* 20 C.F.R. § 416.924(a); *Wilson*, 179 F.3d at 1278 n.1.

[11]*See Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. April 9, 1998) (claimant properly denied benefits under old, less restrictive standard); *Briggs v. Callahan*, 139 F.3d 606 (8th Cir. 1998) (legislative history indicates that new statutory definition imposes a more stringent standard for disability); *Nelson v. Apfel*, 131 F.3d 1228, 1234 - 35 (7th Cir. 1997) (court of appeals defers to agency's reasonable interpretation that a claimant who was properly denied benefits under old standard would also be denied benefits under the new standard); *Lee v. Chater*, No. 96-3613, 1997 WL 559959, at *1 n.1 (7th Cir. 1997) (unpublished decision in table at 124 F.3d 204) (citing SSA Emergency Teletype No. EM-96-131, court of appeals finds new definition of disability more stringent than the old); *Brown v. Callahan*, 120 F.3d 1133, 1135 (10th Cir. 1997) (analysis on appeal stops after finding substantial evidence supporting ALJ's findings on first three steps because new version eliminates the fourth step:  comparable severity); *Jamerson v. Chater*, 112 F.3d 1064, 1066, 1068 (9th Cir. 1997) (citing SSA Emergency Teletype No. EM-96-131, court of appeals defers to agency's reasonable interpretation that the new standard is "more demanding" and "more stringent," but declines to interpret the precise effect of the new standard in advance of the impending rules); *see also, Quinones v. Chater*, 117 F.3d 29, 33 n.1 (2d Cir. 1997) (Commissioner waived any argument regarding applicability of new childhood disability definition to this case because he had not yet promulgated the new regulations).

a statutory scheme it is entrusted to administer); *accord, Jamerson v. Chater*, 112 F.3d 1064, 1065 -

66 (9th Cir. 1997); *Nelson*, 131 F.3d at 1234 - 35.  A district court will not defer, however, if the

agency's interpretation is manifestly contrary to the statutory standard that the regulations purport to

implement.  *Sullivan v. Zebley*, 493 U.S. 521, 528, 541 (1990) (Commissioner's pre-1990 childhood

disability regulations did not carry out the requirement in the former statute that SSI benefits shall be

provided to children with any impairment of comparable severity).

### D.   The Evaluation of Mental Disorders

The structure of the mental disorders listings for children under age 19 parallel the structure

of the mental disorders listings for adults, but it is modified to reflect the presentation of mental

disorders in children. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The evaluation of disability on the basis of

mental disorders requires the documentation of a medically determinable impairment, as well as

consideration of the degree of limitation applicable to children.  The listing for mental disorders in

children are arranged in eleven diagnostic categories, including attention deficit hyperactivity

disorder (112.11).  20 C.F.R. Pt. 404, Subpt. P, App. 1.  A mental impairment is medically equivalent

to a listed mental impairment if the medical findings are at least equal in severity and duration to the

listed findings.  20 C.F.R. § 404.1526.

For mental disorders, severity is assessed in terms of the functional limitations imposed by

the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings

for mental disorders (motor function, cognitive/communicative function, social function; personal

function, and concentration, persistence, or pace).  20 C.F.R. Pt.404, Subpt. P, App. 1.  In most

functional areas, there are two alternative methods of documenting the required level of severity: 1.)

use of standardized tests alone, where appropriate test instruments are available; and 2.) use of other

medical findings. *Id.* The use of standardized tests is the preferred method of documentation if such

tests are available. *Id.*

A "marked" degree of limitation means more than moderate, but less than extreme. A

marked limitation may arise when several activities or functions are impaired or even when only one

is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to

function independently, appropriately and effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The

Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all

evidence needed to evaluate mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The

technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a

and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports

from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and

clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical

sources may be used to obtain detailed descriptions of the child's motor, personal,  social,

cognitive/communicative functioning, and concentration, persistence and pace. This information can

be provided by programs such as community mental health centers, day care centers, and family

members who have knowledge of the individual's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, descriptions of the child's activities of daily living or social functioning given by

individuals or treating sources may be insufficiently detailed and/or may be in conflict with the

clinical picture otherwise observed or described in the examinations or reports. It is necessary to

resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the child's functional restrictions.

A child's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in children who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Children with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such children may be much more impaired for work than their signs and symptoms would indicate. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The results of a single examination may not adequately describe these children's sustained ability to function. It is, therefore, vital to review all pertinent information relative to the child's condition, especially at times of increased stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1. It is mandatory to attempt to obtain adequate descriptive

information from all sources which have treated the child either currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that a child's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in children with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

The Listing for Attention Deficit Hyperactivity Disorder, 20 C.F.R. § Pt. 404, Subpt. P. App. 1, § 112.11, requires:

A.   Medically documented findings of all three of the following:

1.   Marked inattention; and
2.   Marked impulsiveness; and
3.   Marked hyperactivity;

-21-

AND

B.      . . . for children (age 3 to attainment of age 18), resulting in at least two of the
        appropriate age group criteria in paragraph B2 of 112.02.

20 C.F.R. Pt. 404, Subpt. P. App.1, § 112.11.   For children (age 3 to attainment of age 18),

Paragraph B2 of 112.02 requires at least two of the following:

a.      Marked impairment in age-appropriate cognitive/communicative function,
        documented by medical findings (including consideration of historical and
        other information from parents or other individuals who have knowledge of
        the child, when such information is needed and available) and including, if
        necessary, the results of appropriate standardized psychological tests, or for
        children under age 6, by appropriate tests of language and communication; or

b.      Marked impairment in age-appropriate social functioning, documented by
        history and medical findings (including consideration of information from
        parents or other individuals who have knowledge of the child, when such
        information is needed and available) and including, if necessary, the results of
        appropriate standardized tests; or

c.      Marked impairment in age-appropriate personal functioning, documented by
        history and medical findings (including consideration of information from
        parents or other individuals who have knowledge of the child, when such
        information is needed and available) and including, if necessary, appropriate
        standardized tests; or

d.      Deficiencies of concentration, persistence, or pace resulting in frequent failure
        to complete tasks in a timely manner.

20 C.F.R. Pt. 404, Subpt. P,  App. 1, § 112.02 B. 2.

An individual may meet the separate Listing for mental retardation if he has a valid verbal,

performance, or full scale IQ of 60 through 70, and a physical or other mental impairment imposing

additional and significant work- related limitation of function.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §

12.05.

-22-

### E.    Treating Physicians

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v.* Callahan, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (d). However, a treating physician's opinion

-23-

is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527 (e).   The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner.  20 C.F.R. § 404.1527 (e).

**F.      Developing the Record**

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. *See Cowart*, 662 F.2d at 735 - 36.  However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously

-24-

probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

### G.     Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### H.     Credibility

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Foote,* 67 F.3d at 1561-62*; Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective

pain testimony requires that the testimony be accepted as true. *Foote*, 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

V.    **APPLICATION AND ANALYSIS**

A.    **The Facts**

On July 28, 1999, Anthony went to the ER for complaints of pain in his left thigh and hip. X-rays revealed a widening of the epiphysis from the left femoral head without evidence of dysplasia, and fracture was ruled out. The diagnosis was slipped capital femoral ephiphysis, grade 1. James W. Depuy, M.D., performed an open reduction and internal fixation surgery on Anthony's left hip. X-rays conducted after surgery showed a normal alignment and position of the femoral head. Anthony was discharged and advised to use crutches and avoid weight bearing on his left leg. R. 146-53.

During a follow-up examination on August 10, 1999, Dr. Depuy observed that Anthony was doing well, but he appeared to be non-compliant with his discharge instructions not to walk or put weight on his left leg. Dr. Depuy reiterated that Anthony needed to avoid weight bearing on the left

leg for six more weeks.  R. 154.  On September 9, 1999, Anthony reported doing well, experiencing

no symptoms, and had been using his crutches.  Dr. Depuy observed a full range of motion and a

negative roll sign without evidence of any problems.  R. 155.  On September 29, 1999, Dr. Depuy

performed preventive surgery and pinning of the right hip.  R. 161-62.

On October 16, 1999, Vizcaino completed a disability questionnaire regarding Anthony's

activities of daily living.  She noted that he could not ride a bicycle, climb stairs alternating feet, tell

stories from memory, or follow rules at home or school.  She also noted that Anthony played with

other children, shared toys, had a group of friends, had a best friend, showed concern for others and

in the community, and was able to dress and groom himself.  Finally, she noted that Anthony was not

taking any medication.  R. 101-03.

On October 28, 1999, Dr. Depuy noted that Anthony looked "terrific."  X-rays showed the

hardware from the second surgery to be intact without evidence of increased slippage on either side.

Dr. Depuy noted that Anthony would need additional hardware before beginning contact sports.  He

also noted the hardware would need to be removed by the time Anthony became a teenager.  R. 156.

On November 8, 2000, Anthony's sixth grade guidance counselor completed a school

questionnaire for disability purposes.  She noted that she had known Anthony for about two months,

but did not see him regularly.  According to Anthony's teachers, Anthony had very poor ability to

concentrate and persist at tasks, great difficulty with authority and peers, below average ability to

follow directions, poor ability to express ideas effectively, was functioning below grade level, and

had been suspended three times for disruptive behavior.  The counselor also noted that Anthony had

intelligible speech, was not receiving special services, had appropriate self-care skills, no physical or

mental limitations that impaired his academic performance, and was not taking medication.  Finally, the counselor did not suspect that Anthony had been coached by anyone in order to obtain disability benefits.  R. 123-24.

The record contains another questionnaire (albeit undated and unsigned) completed by Anthony's seventh grade guidance counselor.  She noted that Anthony had below average ability to concentrate and persist at tasks, below average/poor behavior, no ability to follow directions, poor ability to express ideas effectively, was not functioning at grade level, and had not been coached to obtain disability benefits.  She also noted that Anthony had intelligible speech, was clean and neat, had no physical or mental impairments that affected his academic performance, was not taking medication, and had no attendance problems (including suspensions).  R. 129-31.

On February 26, 2001, William H. Higgins, Ed.D., performed a psychological evaluation.  He noted that Anthony was stocky and overweight.  Several tests were performed that indicated he was impulsive and had difficulties in perceptual organization.  Dr. Higgins concluded that Anthony was functioning in the low average range of intelligence.  His perceptual and organizational skills were significantly lower than his comprehension and vocabulary skills.  He was likely to benefit from tutoring, which helped him think through problems.  He had little ability to think through and deal with emotions in a thoughtful and careful manner.  Anthony's IQ suggested the need for a more complete evaluation for probable learning difficulties in the above-mentioned areas.  R. 168-70.

School records from March 14, 2001 note that Anthony would get angry rather than show vulnerability.  He was resistant to help and often did not complete his assignments.  Anthony had self

esteem and weight issues.  He was not prepared for class, but did well when he did his work.  He was not positive to other students to keep the focus off himself.  R. 228.

On April 24, 2001, Jeffrey Cersonsky, M.D., performed a consultative evaluation due to hip surgery and tubes in his ears.  Dr. Cersonsky reviewed Anthony's medical history with Vizcaino, but noted that she was "a horrible source of information," as she did not know very basic elements about Anthony's medical history.  Based on a review of his medical history, Dr. Cersonsky noted that Anthony was diagnosed with severe obesity, status post bilateral slipped femoral capital epiphyses, and chronic ear infection.  Anthony had never been hospitalized and had never taken medications for a prolonged period.  Dr. Cersonsky characterized Anthony's prognosis as good, especially if he lost some weight.  Examination revealed unremarkable extremities, normal gait, dexterity and balance.  Anthony's strength was rated on the low limits of normal.  Overall, Dr. Cersonsky stated that Anthony had a normal developmental assessment, and concluded that Anthony was able to function well in all domains.  He did not require a highly structured or supportive setting, and had an excellent prognosis if he lost weight.  R. 171-73.

On May 9, 2001, Derrick Bailey, M.D., completed a child disability evaluation form.  He concluded that Anthony's impairments did not meet, medically equal, or functionally equal a listing.  He concluded that Anthony had less than marked limitations in four of the six domains (acquiring and using information, attending and completing tasks, interacting with others, and health and physical well-being).  In the two remaining domains, Anthony had no limitations.  Regarding the domain of attending and completing tasks, Dr. Bailey questioned the questionnaire completed by Anthony's guidance counselors.  He opined that their conclusions that Anthony had concentration

-29-

and persistence limitations indicated merely a contextual problem, and that in a one-on-one setting, Anthony had better concentration.  R.  174-81.

On August 27, 2001, Anthony went to the ER for complaints of upper leg pain bilaterally.  X-rays revealed a stable postoperative appearance and no new abnormalities were detected.  The diagnosis was bursitis of both hips.  Treatment comprised rest, Tylenol, and heat.  R. 185-86, 188. On September 19, 2001, Anthony went to the orthopedic clinic for complaints of bilateral leg pain. Anthony described having pain for the last 3-4 weeks, and stated that playing sports increased the pain.  Rest provided good relief.  Anthony was taking Tylenol #3.  He was described as stocky and not very flexible, but had a good range of motion of the hips.  Treatment comprised switching to Motrin, rest for one month, and no sports.  R. 192, 194.

On August 31, 2001, Marcela Vizcaino completed a disability questionnaire.  She noted that Anthony was taking over-the-counter medication for pain, but the medication was not providing him any relief.  R. 104-11.

On December 12, 2001, Anthony returned to the orthopedic clinic.  Anthony stated that he had pain in both hips most of the time, but that he was still able to play sports without much pain.  It was noted that he came to the clinic intermittently.  He was described as obese.  Examination showed good range of motion.  Anthony was noted to be doing well, and was advised to lose weight and to follow-up as needed.  R. 192.

On January 9, 2002, Barbara Coughlin, M.D., completed a Childhood Disability Evaluation Form.  Dr. Coughlin concluded that Anthony had severe impairments, but did not medically or functionally equal the listings.  She determined that Anthony had less than marked limitations in the

domains of acquiring/using information and attending/completing tasks, a marked limitation in the domain of interacting/relating with others, no limitation to less-than-marked limitations in the domain of moving about and manipulating objects, and no limitations in the domains of caring for self and health/physical well-being.  R. 195-99.

From March 7-11, 2002, Emily J. Renninger, M.S., C.A.S., performed a psychological evaluation to determine whether Anthony qualified as a special education student.  She determined that he was functioning in the low average range of intelligence, and was easily frustrated by difficult tasks.  While he had issues with self esteem, problematic behaviors seemed to be most influenced by an aggrandized sense of empowerment combined with immature coping mechanisms and a need to present as capable of defending himself.  Dr. Renninger concluded that Anthony needed appropriate interventions in his areas of academic weaknesses and with his inappropriate behavior.  R. 235-38.

On March 14, 2002, Debra A. Quinones, a school social worker, conducted a family interview to determine Anthony's eligibility for special education services.  Vizcaino stated that due to illnesses, Anthony was absent frequently during kindergarten.  By first grade, his attendance had improved, and until the third grade, Anthony did well and his health was good.  By the end of the fourth grade, Anthony had hip surgery, requiring him to miss many days of school.  She stated that Anthony returned to fifth grade late, in mid-October, and did well academically, but his physical activity was limited.  She stated that this resulted in attitude problems.  Thereafter, Anthony transferred to Broadview school, and his transition was problematic.  He had continuing attitude problems and was disruptive in class.  However, he then transferred to a different program, known as

Rebound.  Vizcaino reported that Anthony did better due to the smaller setting.  She stated that at present, Anthony was doing better and had not received any bad reports.  R. 232-34.

School records from March 14, 2002 indicated Anthony was still disruptive in class, but did not qualify for learning disability special education classes.  R. 229.  A review of final grades from kindergarten through fifth grade show performance ranging from above average to below average.  R. 214.  In addition, Anthony's performance in seventh grade also ranged from above average to below average, with his teachers' comments ranging from disruptive to excellent participation.  Anthony's grades in eighth grade ranged from above average to below average.  R. 213.  R. 217.  Finally, Anthony's scores on the Connecticut Mastery Test during sixth through eighth grades ranged from the lowest to the second lowest levels possible on the test.  R. 210-11.

**B.**     **The Analysis**

Anthony does not argue that the Commissioner's childhood disability regulations have failed to implement the statute enacted by Congress; that the new regulations are manifestly contrary to the statute; or that the new regulations exceed the Commissioner's statutory authority.  Neither does Anthony argue that the Commissioner's listings-only approach to child disability is more restrictive and severe than the child disability standard most recently enacted by Congress.[12]  Accordingly, the

---

[12]Which version of the statute is "more stringent" is not readily apparent from a comparison of the old and new statutory language.  Without considering more than the statutory language, one cannot determine which is more severe:  1.) an "impairment of comparable severity" to that which would prevent an adult from engaging in substantial gainful activity;  or 2.) an "impairment which results in marked and severe functional limitations."  *See* 42 U.S.C. § 1382c (a)(3)(C).   It is, however, readily apparent that the new implementing regulations are generally more "severe" than the old post-*Zebley* regulations.  *See Wilson v. Apfel*, 179 F.3d 1276, 1277 - 78 (11th Cir. 1999).  The Commissioner has discarded the "comparable severity" regulations and the post-*Zebley* individualized functional assessment, 20 C.F.R. §§ 416.924d and 416.924e, and has replaced those regulations with new ones that should implement the new "marked and severe functional limitations" standard directed by Congress.  Level of functioning in
(continued...)

Court does not address those issues, and accords proper deference to the Commissioner's interpretation.

      **1.**      **The ALJ Properly Evaluated Anthony's Limitations in the Domains.**

Anthony argues that his impairments were far more severe than the ALJ had determined. Specifically, he contends that he had at least marked limitations in the following three domains: 1.) attending and completing tasks; 2.) interacting and relating with others; and 3.) overall health and physical well-being. However, the evidence does not support a marked limitation in these domains.[13]

      a.      Attending and Completing Tasks

For adolescents between the ages of twelve and fourteen, this domain considers how well a child is able to focus and maintain attention, as well as his ability to plan, carry through and finish

---

[12](...continued)
children is an explicit consideration in deciding which impairment is of sufficient severity to be included in an individual listing. H.R. CONF. REP. NO. 104-725, 104th Cong., 2nd Sess. 1996, 1996 U.S. CODE CONG. & AD. NEWS 2649 (available on Westlaw at 1996 WL 443732 at 744). Functional equivalence is a criterion in crafting the Listing of Impairments so as to ensure the proper consideration of disability in children. *Id.* The new regulations expressly direct the assessment of functional equivalence for children whose impairments do not meet or equal in severity a listed impairment. 20 C.F.R. § 416.926a.

[13]Anthony does not specifically contend that the ALJ erred in her evaluation of the remaining three domains. The Court does not address issues not raised on appeal.

activities, including the pace at which those activities are performed.[14] The ALJ correctly concluded that Anthony had a mild limitation in this domain.

No physicians/psychologists have opined that Anthony has any mental impairment. In February 2001, Dr. Higgins opined that Anthony had average (albeit low average) intelligence, and stated that Anthony may benefit from tutoring. In April 2001, Dr. Cersonsky, determined that Anthony functioned well in all domains. In May 2001 and January 2002, Drs. Bailey and Coughlin concluded that Anthony had less than marked limitations in this domain. In March 2002, Dr. Renninger determined that Anthony had average (albeit low average) intelligence, but was easily frustrated by difficult tasks and had immature coping mechanisms. Thus, the clinical impressions of Anthony's doctors demonstrate mild impairments.

Anthony's performance in school, which showed widely ranging grades and behavior, establishes mild impairments. Anthony's academic performance varied from above average to below average during the longitudinal period at issue. Although Anthony performed poorly in Connecticut standardized testing in sixth through eighth grades (scoring in the lowest percentiles), no doctors or teachers found that he qualified for learning disability classes, and he was always promoted to higher

---

[14]The regulations provide:

> In your later years of school, you should be able to pay attention to increasingly longer presentations and discussions, maintain your concentration while reading textbooks, and independently plan and complete long range academic projects. You should be able to organize your materials and to plan your time in order to complete school tasks and assignments. In anticipation of entering the workplace, you should be able to maintain your attention on a task for extended periods of time, and not be unduly distracted by your peersor unduly distracting to them in a school or work setting.

20 C.F.R. § 416.926a(h)(2)(v).

grades.  Anthony's guidance counselors in sixth and seventh grade opined that Anthony had poor or below average concentration and persistence.  However, Dr. Bailey opined subsequently that Anthony's problems were merely contextual, and that he stated that Anthony would do better in smaller settings.  Finally, progress reports obtained from Anthony's teachers in March of 2002 provided a conflicting picture of Anthony's ability to complete his class work and home work.  It is the ALJ's responsibility, as the finder of fact, to resolve the conflicts.  Overall, the Commissioner did not err in finding mild limitations in this domain.

b.  Interacting and Relating with Others

For adolescents, this domain considers how well the child can develop friendships and relationships with peers and adults.[15]  The ALJ found that, despite some difficulties, Anthony had a mild limitation in this domain.  The ALJ was correct.

The evidence does show that Anthony had impairments in this domain, but they were less than marked limitations.  Anthony's sixth grade guidance counselor stated that Anthony was part of a

---

[15]The regulations provide:

> By the time you reach adolescence, you should be able to initiate and develop friendships with children who are your age and to relate appropriately to other children and adults, both individually and in groups. You should begin to be able to solve conflicts between yourself and peers or family members or adults outside your family.  You should recognize that there are different social rules for you and your friends and for acquaintances or adults. You should be able to intelligibly express your feelings, ask for assistance in getting your needs met, seek information, describe events, and tell stories, in all kinds of environments (e.g., home, classroom, sports, extra-curricular activities, or part-time job), and with all types of people (e.g., parents, siblings, friends, classmates, teachers, employers, and strangers).

20 C.F.R. § 416.926a(i)(2)(v).

group for students at risk.  Indeed, Anthony was thrice suspended for disruptive behavior.  In addition, several of Anthony's seventh grade teachers noted that Anthony was disruptive.

But during a psychological evaluation in February 2001, Dr. Higgins noted that Anthony interacted with him in a friendly manner, maintained good eye contact, and responded positively to attempts at humor.  Dr. Higgins believed that Anthony maintained a positive relationship with his parents and became more comfortable with other children once he got to know them.  In an interview with a school social worker in March 2002, Vizcaino stated that Anthony had friends of his own age, could make new friends, and generally got along with her and other adults, although he didn't get along with his teachers.  At home, Anthony had no behavior problems and maintained a good relationship with his siblings. Although Anthony had a history of behavioral problems, he improved after transferring into the Rebound program in January of 2002.  Indeed, Ms. Vizcaino had not received any reports of inappropriate behavior since the transfer.  The evidence does not show marked limitations.

Anthony also argues that the ALJ failed to consider Dr. Coughlin's "uncontroverted" opinion (rendered in January 2002) that Anthony had a marked limitation in this domain.  However, Dr. Coughlin's opinion is not consistent with the evidence.  None of Anthony's physicians or psychologists opined that Anthony has greater than mild impairments in this domain.  In April 2001, Dr. Ceronsky determined that Anthony was functioning well in all domains.  In May 2001, Dr. Bailey found that Anthony had less than a marked impairment in this domain.  Thus, substantial evidence supports the ALJ's opinion.  But even if the ALJ erred by failing to adopt Dr. Coughlin's opinion, such error is not reversible, because Anthony failed to establish a marked limitation in at least one of

the remaining five domains to warrant a finding that his condition was functionally equivalent to the

Listing of Impairments.

c.      Overall Health and Physical Well-Being

This domain considers the cumulative physical effects of the claimant's physical and mental

impairments, as well as any associated treatments or therapies on an individual's ability to function.[16]

Anthony contends that he had at least a marked limitation in this domain. The Court disagrees.

The evidence merely shows that Anthony underwent surgery for hip impairments, but had a

successful recovery with barely sporadic complaints thereafter.  In July 1999, Anthony underwent an

open reduction and internal fixation on his left hip.  In August 1999, Anthony was doing well.  In

September 1999, Anthony reported doing well, experienced no symptoms, and had a full range of

motion.  Later in September 1999, Anthony underwent preventive surgery and pinning of the right

hip.  In October 1999, Dr. Deputy, Anthony's surgeon, noted that Anthony looked terrific, x-rays

---

[16]20 C.F.R. § 416.926a(l).  The Commissioner's regulations define "marked" limitations as:

> [W]e may also consider you to have a "marked" limitation if you are frequently
> ill because of your impairment(s) or have frequent exacerbations of your
> impairment(s) that result in significant, documented symptoms or signs. For
> purposes of this domain, "frequent means that you have episodes of illness or
> exacerbations that occur on an average of 3 times a year, or once every 4
> months, each lasting 2 weeks or more. We may also find that you have a
> "marked" limitation if you have episodes that occur more often than 3 times in
> a year or once every 4 months but do not last for 2 weeks, or occur less often
> than an average of 3 times a year or once every 4 months but last longer than 2
> weeks, if the overall effect (based on the length of the episode(s) or its
> frequency) is equivalent in severity.

20 C.F.R. § 416.926a(e)(2)(iv).

showed the hardware from the second surgery to be intact, and there was no evidence of increased slippage on the left side.  Anthony was not taking medication at this time.

In April 2001, Anthony was not taking any medications, and was able to run at times.  In May 2001, Dr. Bailey found that Anthony had a less than marked limitation in this domain.  Although Anthony complained of pain in August  2001, x-rays revealed a stable postoperative appearance and no new abnormalities.  In September 2001, Anthony complained of pain while playing sports.  Examination showed good range of motion of the hips.  Treatment comprised over the counter medication and rest.  In December 2001, Anthony complained of pain, but stated that he was still able to play sports without much pain.  Examination showed good range of motion.  In January 2002, Dr. Coughlin found that Anthony had less than a marked limitation in this domain.  In sum, the evidence shows less than marked limitations in this domain.

> **2.      The ALJ Properly Developed the Record Concerning Anthony's Hip Impairments.**

Finally, Anthony argues that the ALJ failed to fully develop the record concerning his hip impairment.  Specifically, Anthony contends that the ALJ should have ordered a consultative evaluation.  This argument is meritless.  The record contained sufficient evidence regarding Anthony's impairments for the ALJ to render her decision.  Anthony bears the ultimate burden of proving disability, but he failed to furnish medical and other evidence sufficient to show functional limitations due to Anthony's hip impairments.  Anthony also submits that, during the administrative hearing, the ALJ failed to inquire regarding the completeness of the record.  To the contrary, the ALJ specifically asked Vizcaino "Did you have any objections or problems with anything that's in this

file?"  Vizcaino responded, "No, not now."  The ALJ further inquired "But other than [a specific

medical record previously discussed] are there any other records that you believe are missing?"

Again, Vizcaino responded, "No.  No."  R. 263-64.  The ALJ fully and fairly developed the record.

**VI.**     **CONCLUSION**

For the reasons stated above, the decision of the Commissioner should be **AFFIRMED**.  The

Clerk should enter a judgment.

**DONE AND ORDERED** this 20th day of July, 2005.


JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE



The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia          30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL               33602

-39-

The Honorable Deirdre R. Horton
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
157 Church Street, 22nd Floor
New Haven, CT 06510